UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

| | | |
|---|---|---|
| MICHAEL COLOSI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:24-cv-01004-JES-KCD |
| | ) | |
| CHARLOTTE COUNTY, FLORIDA; | ) | **RESPONSE OF DEFENDANT-** |
| UNITED STATES FISH AND | ) | **INTERVENORS TO** |
| WILDLIFE SERVICE; PAUL SOUZA, | ) | **DEFENDANTS' MOTIONS** |
| in his official capacity as Director of the | ) | **TO DISMISS AND** |
| United States Fish and Wildlife Service; | ) | **CONTINGENT MOTION** |
| MIKE OETKER, in his official capacity | ) | **FOR SUMMARY JUDGMENT** |
| as Regional Director of the United States | ) | |
| Fish and Wildlife Service Southeast | ) | |
| Region; UNITED STATES | ) | |
| DEPARTMENT OF THE INTERIOR; | ) | |
| and DOUG BURGUM, in his official | ) | |
| capacity as Secretary of the Interior, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| FLORIDA WILDLIFE FEDERATION, | ) | |
| ENVIRONMENTAL | ) | |
| CONFEDERATION OF SOUTHWEST | ) | |
| FLORIDA, AMERICAN BIRD | ) | |
| CONSERVANCY, and CENTER FOR | ) | |
| BIOLOGICAL DIVERSITY, | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |
| | ) | |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION .............................................................................................. 1

BACKGROUND ................................................................................................ 3

I.   The Florida Scrub-Jay ........................................................................... 3

II.  The Endangered Species Act .................................................................. 4

III. The Charlotte County Habitat Conservation Plan ................................ 6

IV.  Plaintiff's Property and This Lawsuit ................................................... 7

LEGAL STANDARD ........................................................................................ 8

ARGUMENT .................................................................................................... 8

I.   The County's Rule 12(b)(6) Motion Implicates a Constitutional Question Under the Commerce Clause that Should Be Decided on the Basis of Particular Facts, not Broad and Baseless Allegations. ..................................... 9

II.  The Service's Regulation of Florida Scrub-Jay Take Reflects a Valid Exercise of Congress's Power Under the Commerce Clause and the Necessary and Proper Clause. .......................................................................................... 10

   A. Every Appellate Court to have Considered Plaintiffs' Theory has Rejected it. ..................................................................................... 10

   B. Regulation of Florida Scrub-Jay Take *Itself* Has a Substantial Effect on Interstate Commerce, Exemplifying Why the Courts Have Unanimously Rejected Plaintiff's Theory. ......................................... 13

      1. Florida Scrub-Jays Stimulate Interstate Commerce from Wildlife-Watching Tourism ......................................................... 15

      2. Florida Scrub-Jays Stimulate Significant Interstate Commerce through Scientific Research ......................................................... 18

      3. Commercial Activity Led to the Scrub-Jay's "Threatened" Status and Regulating Scrub-Jay Take is Regulation of Commercial Activity ...... 20

i

III.   If the Court Does Not Dismiss the Case on Jurisdictional Grounds, It Should Consider Conservation Groups' Evidence and Grant Summary Judgment in Their Favor. ...............................................................................................22

CONCLUSION ...................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Alabama State Fed'n of Labor v. McAdory*,
  325 U.S. 450 (1945) ................................................................9

*Alabama-Tombigbee Rivers Coal. v. Kempthorne*,
  477 F.3d 1250 (11th Cir. 2007)..................................... 2, 10, 11, 11–12, 12, 13, 20

*Babbitt v. Sweet Home Chapter of Cmties. for a Great Or.*,
  515 U.S. 687 (1995) ................................................................5

*Clinton v. Jones*,
  520 U.S. 681 (1997) .............................................................1, 2, 9, 10

*GDF Realty Invs. Ltd. v. Norton*,
  326 F.3d 622 (5th Cir. 2003) .............................................................10

*Gibbs v. Babbitt*,
  214 F.3d 483 (4th Cir. 2000) ..................................2, 9, 10, 12, 13, 14, 17, 20, 21

*Gonzales v. Raich*,
  545 U.S. 1 (2005)................................................................11

*Harbert Int'l, Inc. v. James*,
  157 F.3d 1271 (11th Cir. 1998).................................................... 24–25

*Jones v. City of Columbus*,
  120 F.3d 248 (11th Cir. 1997) .............................................................24

*Nat'l Advert. Co. v. City of Miami*,
  402 F.3d 1335 (11th Cir. 2005).............................................................24

*Nat'l Ass'n of Home Builders v. Babbitt*,
  130 F.3d 1041 (D.C.Cir.1997)................................................................10

*People for Ethical Treatment of Prop. Owners v. U.S. Fish & Wildlife Serv.*,
  852 F.3d 990 (10th Cir. 2017) ........................................... 10, 11, 12, 21

*Prop. Mgmt. & Invs., Inc. v. Lewis*,
  752 F.2d 599 (11th Cir. 1985) ........................................................22

*Rancho Viejo v. Norton*,
  323 F.3d 1062 (D.C. Cir. 2003)...............................................................10

*San Luis & Delta-Mendota Water Auth. v. Salazar,*
    638 F.3d 1163 (9th Cir. 2011) ....................................................................10

*Sharkey v. Food & Drug Admin.,*
    250 F. App'x 284 (11th Cir. 2007) ............................................................25

*United States v. Lopez,*
    514 U.S. 549 (1995) ....................................................................................11

*United Water Conservation Dist. v. United States,*
    133 F.4th 1050 (Fed. Cir. 2025) ...............................................................24

## STATUTES

16 U.S.C. § 1531(a)(1) .......................................................................................4

16 U.S.C. § 1531(b) ...........................................................................................4

16 U.S.C. § 1532(6) ...........................................................................................4

16 U.S.C. § 1532(19) .........................................................................................5

16 U.S.C. § 1532(20) .........................................................................................4

16 U.S.C. § 1533 ................................................................................................4

16 U.S.C. § 1533(c) ...........................................................................................4

16 U.S.C. § 1533(d) ...........................................................................................5

16 U.S.C. § 1538(a)(1)(B) .................................................................................5

16 U.S.C. § 1539(a)(1)(B) .................................................................................5

16 U.S.C. § 1539(a)(2)(B) .................................................................................5

Charlotte County Code, pt. III, § 3-5-266 ........................................................6

## REGULATIONS AND ADMINISTRATIVE MATERIALS

50 C.F.R. § 17.21(c) ..........................................................................................5

50 C.F.R. § 17.3 ................................................................................................5

50 C.F.R. § 17.31(a) ..........................................................................................5

52 Fed. Reg. 20,715 (June 3, 1987) ...........................................................3, 20

88 Fed. Reg. 41,981 (June 28, 2023)..........................................................21

**RULES**

Fed. R. Civ. P. 12(b)(6)....................................................... 1, 2, 8, 9

Fed. R. Civ. P. 12(d)......................................................... 2, 8, 22

Fed. R. Civ. P. 56(a)......................................................... 8, 23

Fed. R. Civ. P. 56(b)............................................................8

Fed. R. Civ. P. 56(d)...........................................................24

**OTHER AUTHORITIES**

Fla. Fish & Wildlife Conservation Comm'n, *The 2011 Economic Benefits of Wildlife Viewing in Florida* ii (2013) ...............................................17

Florida Crossroads Commerce Park website, https://floridacrossroadspark.com/ ..............................................21

U.S. Fish & Wildlife Serv., *Birding in the United States: A Demographic and Economic Analysis* (2024)...............................................17

U.S. Fish & Wildlife Serv. & Nat'l Marine Fisheries Serv., *Habitat Conservation Planning and Incidental Take Permit Processing Handbook* §§ 9.4.2 and 9.4.3 (2016) ...........................................................6

U.S. Fish & Wildlife Serv., *Species Status Assessment: Florida Scrub-Jay* (2019) .................................................................. 3, 4, 21

**INTRODUCTION**

Defendant-Intervenors Florida Wildlife Federation, et al. ("Conservation Groups") hereby respond to the motions to dismiss filed by the Federal Defendants and Charlotte County (the "County") and add their own contingent motion for summary judgment. The Conservation Groups proceed in this manner to ensure that, if the Court rules on the Commerce Clause issue raised in the Plaintiff's Amended Complaint and implicated in the Rule 12(b)(6) portion of the County's motion to dismiss, the Court will do so on a record of relevant facts demonstrating that protection of the Florida Scrub-Jay under the Endangered Species Act ("ESA") has a substantial effect on interstate commerce.[1]

The Court should not reach that constitutional question if it grants the County's motion to dismiss on jurisdictional grounds. Conservation Groups take no position on that portion of the County's motion, or on the Federal Defendants' motion to dismiss on related jurisdictional grounds. But if the Court does reach the Commerce Clause issue, it should heed the Supreme Court's admonition that courts should not "decide any constitutional question except with reference to the particular facts to which it is to be applied." *Clinton v. Jones*, 520 U.S. 681, 690 n.11 (1997) (cleaned up[2]). Thus, it should consider the declarations that Conservation Groups submit with this combined response and summary judgment motion and (1) convert

---

[1] This Response and Contingent Motion is supported by the accompanying declarations of Bloom, Gilliland, Goggin, Gyllenhaal, Lamoreaux, Lebbin, Nigro, Russell, Schibley, and Swain.

[2] This brief uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations.

1

the County's Rule 12(b)(6) motion into "one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d); (2) address Conservation Groups' own motion for summary judgment on all of Plaintiff's claims; and (3) grant summary judgment for the Conservation Groups and dismiss the Amended Complaint.

We show below that under controlling Circuit precedent, the U.S. Fish and Wildlife Service's regulation of the "take" of Florida Scrub-Jays reflects a valid exercise of Congress's power under the Commerce Clause and Necessary and Proper Clause. *See Alabama-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1275–77 (11th Cir. 2007). That would be so even if, as Plaintiff baselessly alleges, the Florida Scrub-Jay, by itself, lacked a substantial effect on interstate commerce, because the ESA as a whole does have such an effect and that is sufficient to decide this case. *See id.* But the Conservation Groups' evidence additionally shows that the factual premise of Plaintiff's Commerce Clause argument is false—the Florida Scrub-Jay itself *does* substantially effect interstate commerce—and that supplies an additional, more fact-specific ground for dismissing Plaintiff's claims. The evidence is consistent with persuasive Commerce Clause jurisprudence regarding the ESA, *see Gibbs v. Babbitt*, 214 F.3d 483, 493–96 (4th Cir. 2000), and ensures that the Court's adjudication of this important constitutional question is undertaken on the basis of the particular facts at issue in this case, *see Clinton*, 520 U.S. at 690 n.11.

## BACKGROUND

### I.    The Florida Scrub-Jay

The Florida Scrub-Jay ("Scrub-Jay") is a blue songbird that exists solely within the State of Florida. Am. Compl. ¶¶ 18–19, ECF 38. It evolved to require habitat consisting of scrub oaks kept short and interspersed with openings due to fire.[3] As agricultural and residential development in Florida accelerated in the 1960s to accommodate a population boom, Scrub-Jay habitat destruction and degradation accelerated as well, leading the U.S. Fish and Wildlife Service (the "Service") to list the Scrub-Jay as "threatened" under the ESA in 1987. Endangered and Threatened Wildlife and Plants; Threatened Status for the Florida Scrub-Jay, 52 Fed. Reg. 20,715 (June 3, 1987) ("Listing Decision") (Bloom Decl. Ex. B). As the Service noted, "most scrub lands are in areas that have high real estate interest," "[m]uch of the coastal scrub has been cleared for beachfront hotels, houses, and condominiums," and "[s]crub habitats in the interior of the Florida peninsula are subject to development for citrus groves and housing developments." *Id.* at 20,717.

Since the listing of the Florida Scrub-Jay, commercial, residential, and agricultural development continues to cause habitat loss and fragmentation, and makes it significantly harder for wildlife managers to conduct prescribed burns to maintain suitable scrub habitat. *See* Species Status Assessment (*supra* note 3), at 17–19, 29–30. As a result, despite conservation efforts, the Florida Scrub-Jay population

---

[3] *See* Am. Compl. ¶ 18; U.S. Fish & Wildlife Serv., *Species Status Assessment: Florida Scrub-Jay* (Aphelocoma coerulescens) 29 (2019), ("Species Status Assessment") (Bloom Decl. Ex. A).

3

has continued to decline since the species was listed, culminating in an estimated 90

percent drop from its historic size. *See id.* at 21. Although large populations of

Florida Scrub-Jays are found on federal land, the Service has recognized that species

survival depends on protecting Scrub-Jays and their dwindling scrub habitat on non-

federal land as well. *See id.* at 44 (due to steady and rapid population declines, "this

highly fragmented species requires maximizing potential opportunities for

persistence across the entire current range"); 76–118 (mapping habitat needed for

recovery, much on non-federal land).

## II.    The Endangered Species Act

In 1973, finding that certain wildlife species "ha[d] been rendered extinct as a

consequence of economic growth and development untempered by adequate concern

and conservation," Congress passed the ESA. 16 U.S.C. § 1531(a)(1). The ESA's

purpose is "to provide a means whereby the ecosystems upon which endangered

species and threatened species depend may be conserved, [and] to provide a program

for the conservation of such endangered species and threatened species." *Id.* §

1531(b).

To afford a terrestrial species the protections of the ESA, the Service must first

list the species as either "endangered" or "threatened" under section 4 of the ESA.

*See* 16 U.S.C. § 1533. A species is "endangered" when it "is in danger of extinction

throughout all or a significant portion of its range," *id.* § 1532(6); it is "threatened"

when it is "likely to become an endangered species within the foreseeable future," *id.*

§ 1532(20); *see also id.* § 1533(c).

4

The ESA affords substantive and procedural protections to listed species. Most important here, the ESA generally prohibits the "take" of listed species. *Id.* § 1538(a)(1)(B), 50 C.F.R. § 17.21(c) (endangered species); 16 U.S.C. § 1533(d), 50 C.F.R. § 17.31(a) (threatened species). To "take" a listed species is "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" it, "or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). "Harm" in this definition of take "may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3; *see Babbitt v. Sweet Home Chapter of Cmties. for a Great Or.*, 515 U.S. 687, 696–708 (1995) (upholding "harm" definition to include significant habitat degradation).

Notwithstanding this prohibition, the Service may issue permits for the take of listed species "if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B). These "incidental take permits" must be issued if the Service finds, based on a "conservation plan" submitted by the applicant, that: "(i) the taking will be incidental; (ii) the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking; (iii) the applicant will ensure that adequate funding for the plan will be provided; (iv) the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild;" and (v) any other measures deemed necessary by FWS will be met. *Id.* § 1539(a)(2)(B). Where the "take" consists of

habitat destruction, mitigation can take the form of the purchase of conservation credits that allow for the acquisition and preservation of suitable habitat elsewhere.[4]

## III.    The Charlotte County Habitat Conservation Plan

Thousands of acres of Florida Scrub-Jay occupied habitat lie within Charlotte County.[5] In 2014, the Service issued Charlotte County a 30-year incidental take permit ("ITP"), based on a County-developed habitat conservation plan ("HCP"), covering impacts from future development in Scrub-Jay habitat within the County. Am. Compl. ¶ 23.[6] The HCP allows owners wishing to develop property within the Plan's coverage area to receive Scrub-Jay incidental take permission by paying a mitigation fee based on the size of their lot and complying with certain pre-set requirements. *Id.* ¶¶ 23, 25, 27, 35.[7]

Charlotte County uses the mitigation fees to purchase and manage land in the eastern portion of the County intended to connect two existing County preserves, thereby creating a larger preserve to provide Scrub-Jay habitat and mitigate the loss of habitat caused by the home construction permitted under the HCP. *Id.* ¶ 26.[8]  In 2015, Charlotte County promulgated an ordinance to implement the HCP. *Id.* ¶ 24.[9] The ordinance and the County's website indicate that landowners may seek their

---

[4] *See* U.S. Fish & Wildlife Serv. & Nat'l Marine Fisheries Serv., *Habitat Conservation Planning and Incidental Take Permit Processing Handbook* §§ 9.4.2 and 9.4.3 (2016) (Bloom Decl. Ex. C).

[5] *See* Charlotte Cnty. Mot. Dismiss Ex. A at 7, ECF 45-1 ("Charlotte County HCP").

[6] *See* Charlotte Cnty. Mot. Dismiss Ex. B, ECF 45-2 ("Incidental Take Permit").

[7] *See* Charlotte County HCP at 54–55, 77; Incidental Take Permit at 2.

[8] *See* Charlotte County HCP at 55–58, 77.

[9] *See* Charlotte Cnty. Mot. Dismiss Ex. C, ECF 45-3 (Charlotte County Code, Part III, § 3-5-266).

own individual incidental take permit from the Service rather than participate in the HCP. *Id.* ¶ 29.

## IV.  Plaintiff's Property and This Lawsuit

In March 2024, aware of the County's HCP and its mitigation fee, Plaintiff Michael Colosi purchased an undeveloped 5.07-acre lot in the Prairie Creek Park subdivision, within the HCP coverage area. *Id.* ¶¶ 40–41. In August 2024, Plaintiff emailed an HCP application to a Charlotte County employee, who replied that the proper way to submit an HCP application was as part of a building permit application. *Id.* ¶¶ 51–53, Ex. F. Plaintiff does not allege that he submitted a building permit application. Instead, in October 2024 he filed the complaint in this action. In February 2025, the Service sent a letter to the County (and provided a copy to Plaintiff) explaining that, contrary to prior indications, "the Service will process applications for individual [incidental take] permits in Charlotte County." *Id.* ¶ 56, Ex. G. Plaintiff does not allege that he pursued an individual incidental take permit from the Service after the Service issued that letter. Instead, in April 2025, he filed the amended complaint here.

The amended complaint includes four claims. The first claim alleges that the County's HCP mitigation fee is an unconstitutional condition on Plaintiff's property rights. *Id.* ¶ 69. Claims two through four assert, in various guises, that the Service's regulation of Florida Scrub-Jay taking on non-federal land is unconstitutional because such taking allegedly does not substantially affect interstate commerce and

thus is not authorized by the Constitution's Commerce and Necessary and Proper Clauses. *Id.* ¶¶ 21–22; 70–102.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a case for "failure to state a claim upon which relief can be granted." However, Rule 12(d) provides that a Rule 12(b)(6) motion "must be treated as one for summary judgment under Rule 56" if "matters outside the pleadings are presented to and not excluded by the court." A summary judgment motion should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Absent a court order or local rule providing otherwise, a summary judgment motion may be filed "at any time until 30 days after the close of all discovery." *Id.* 56(b).

## ARGUMENT

If the Court reaches the County's Rule 12(b)(6) motion (ECF 45 at 17–25), then it should consider the Conservation Group's evidence showing that federal protection of the Florida Scrub-Jay under the ESA facilitates an active and ongoing interstate commerce in wildlife-related tourism and scientific research that attracts visitors from around the country, and it regulates development activity that is itself inherently commercial in nature. Considering this evidence would be consistent with well-established principles governing adjudication of constitutional issues. In so doing, the Court should convert this 12(b)(6) proceeding into one for summary judgment and grant summary judgment for the Conservation Groups.

8

I.    **The County's Rule 12(b)(6) Motion Implicates a Constitutional Question Under the Commerce Clause that Should Be Decided on the Basis of Particular Facts, not Broad and Baseless Allegations.**

Under "deeply rooted" principles of constitutional adjudication, courts should not "decide any constitutional question except with reference to the particular facts to which it is to be applied." *Clinton*, 520 U.S. at 690 n.11 (quoting *Alabama State Federation of Labor v. McAdory*, 325 U.S. 450, 461 (1945)). This doctrine "is applicable to the entire Federal Judiciary." *Id.* at 690.

Here, the Rule 12(b)(6) portion of the County's motion invites the Court to rule on the merits of Plaintiff's Commerce Clause argument—the fundamental issue presented in all three of Plaintiff's claims against the Federal Defendants. In so doing, the County accepts as true (for purposes of its motion) Plaintiff's conclusory allegations that the Florida Scrub-Jay "has no commercial or economic value" and that "take of the Florida [S]crub-[J]ay do[es] not substantially affect interstate commerce." Am. Compl. ¶¶ 20–21.

But those allegations are demonstrably *not* true. The Conservation Groups' evidence, submitted herewith, shows that Florida Scrub-Jays stimulate significant interstate commerce from wildlife-related tourism and scientific research, and that regulating the taking of Scrub-Jays affects commercial land development activities. That evidence bears directly on the Commerce Clause issue raised by the County's motion. *See Gibbs*, 214 F.3d at 493–96 (discussing evidence of specific economic activity related to red wolves in determining that Commerce Clause supported ESA protection for wolves). And it must be considered here in light of the Supreme

9

Court's admonition that courts not "decide any constitutional question except with reference to the particular facts to which it is to be applied." *Clinton*, 520 U.S. at 690 n.11 (cleaned up). Accordingly, the Court should consider Conservation Groups' evidence if it reaches the merits of the constitutional issues in this case.

## II.   The Service's Regulation of Florida Scrub-Jay Take Reflects a Valid Exercise of Congress's Power Under the Commerce Clause and the Necessary and Proper Clause.

### A.   Every Appellate Court to have Considered Plaintiffs' Theory has Rejected it.

The Conservation Groups endorse the County's argument that "the ESA *is* a comprehensive regulatory scheme" authorized by the Commerce Clause. ECF 45 at 22. The six circuits to have considered the question have all ruled that the Service's listing and regulation of the taking of endangered and threatened species reflect valid exercises of Congress's power under the Commerce Clause and Necessary and Proper Clause, regardless of whether the particular species at issue crosses state lines or by itself exerts a substantial effect on interstate commerce. *See Alabama-Tombigbee*, 477 F.3d at 1275–77; *People for Ethical Treatment of Prop. Owners v. U.S. Fish & Wildlife Serv.*, 852 F.3d 990, 1000–08 (10th Cir. 2017) ("*PETPO*"); *San Luis & Delta-Mendota Water Auth. v. Salazar*, 638 F.3d 1163, 1174–77 (9th Cir. 2011); *Rancho Viejo v. Norton*, 323 F.3d 1062 (D.C. Cir. 2003); *GDF Realty Invs. Ltd. v. Norton*, 326 F.3d 622 (5th Cir. 2003); *Gibbs v. Babbitt*, 214 F.3d 483 (4th Cir.2000); *Nat'l Ass'n of Home Builders v. Babbitt*, 130 F.3d 1041 (D.C.Cir.1997).

10

These courts have ruled that the ESA as a whole "is a general regulatory statute bearing a substantial relation to commerce," and that Congress "had a rational basis for believing" that regulating the taking of species that exist only in one state "was an essential part" of the ESA. *Alabama-Tombigbee*, 477 F.3d at 1273-77 (Congress made a rational "determination that the most effective way to safeguard the commercial benefits of biodiversity was to protect all endangered species, regardless of their geographic range"); *see also PETPO*, 852 F.3d at 1006–08 (same, citing decisions from other circuits). These courts have applied the Supreme Court's repeated holding that, "when 'a general regulatory statute bears a substantial relation to commerce, the de minimis character of individual instances arising under that statute is of no consequence.'" *Gonzales v. Raich*, 545 U.S. 1, 17 (2005) (quoting *United States v. Lopez*, 514 U.S. 549, 558 (1995)).

In holding that the ESA is a general regulatory statute bearing a substantial relation to commerce, the Eleventh Circuit noted that (1) the ESA "prohibits all interstate and foreign commerce in endangered species," thus directly regulating a multi-billion dollar black market; (2) the ESA aims to preserve the "incalculable" value of biodiversity, which is "essential to medicine" and "important to improving agriculture and aquaculture"; (3) the ESA aims to preserve species in their natural habitats, which "stimulate[s] commerce" by encouraging wildlife tourism and other wildlife-dependent pursuits; (4) the ESA protects against the loss of unanticipated future scientific and other economic value from listed species; and (5) recovery of listed species could enable their future utilization as articles of commerce. *Alabama-*

*Tombigbee*, 477 F.3d at 1273–75. Other courts have relied on similar findings and more, including: (6) interstate travelers stimulate interstate commerce through recreational observation and scientific study of endangered or threatened species, *Gibbs,* 214 F.3d at 493–94; and (7) the ESA restricts commercial activities that harm threatened and endangered species, the excesses of which led to the necessity of protecting such species from extinction in the first place, *PETPO*, 852 F.3d at 1006.

These courts have also recognized multiple reasons why Congress had a rational basis for concluding that regulation of intrastate species was an essential part of the ESA's overall regulatory scheme. "Congress could not anticipate which species might have undiscovered scientific and economic value," which "is not dependent on whether its habitat straddles a state line," giving Congress "good reason to include all species within the protection of the Act." *Alabama-Tombigbee*, 477 F.3d at 1275. Further, "Congress also recognized the unforeseeable place such creatures may have in the chain of life on this planet" and, "faced with the prospect that the loss of any one species could trigger the decline of an entire ecosystem, destroying a trove of national and commercial treasures," it rationally chose "to protect them all." *Id.* And, importantly, "[a]pproximately sixty-eight percent of species that the ESA protects exist purely intrastate; thus, piecemeal excision of purely intrastate species would severely undercut the ESA's conservation purposes" and "leave a gaping hole" in the statute. *PETPO*, 852 F.3d at 1007.

For the same reasons, Congress had a rational basis to extend the ESA's reach beyond federal land. Endangered and threatened species do not recognize

12

distinctions between federal and non-federal land any more than they do state lines. *See Gibbs*, 214 F.3d at 494. Moreover, the ESA was "motivated in part by the need to extend [endangered species] takings regulation beyond the limited confines of federal land," an extension that "was critical to the overall success of the ESA in halting and reversing the near extinction of numerous species." *Id.*

At core, these courts have rightly recognized the "fundamental irony" of Plaintiff's argument, which posits that Congress is free to protect an abundant, widespread species, "but once economic exploitation has driven that species so close to the brink of extinction that it desperately needs the government's protection, Congress is powerless to act." *Alabama-Tombigbee*, 477 F.3d at 1275. "Such reasoning would eviscerate the comprehensive federal scheme for conserving endangered species and turn congressional judgment on its head." *Id.* (cleaned up) (quoting *Gibbs*, 214 F.3d at 498).

**B.    Regulation of Florida Scrub-Jay Take *Itself* Has a Substantial Effect on Interstate Commerce, Exemplifying Why the Courts Have Unanimously Rejected Plaintiff's Theory.**

While the unanimous precedent discussed above rebuts Plaintiffs' Commerce Clause argument, the particular facts of *this* case show that, contrary to the amended complaint's unsupported allegations, regulation of Florida Scrub-Jay take *itself* has a substantial effect on interstate commerce in many of the same ways that the ESA as a whole does. Indeed, for at least three reasons, regulation of Florida Scrub-Jay take itself directly advances Congress's over-arching goal in the ESA of preserving wildlife and plant resources for interstate commerce while limiting the destructive impact of

13

interstate commerce on those resources. First, Florida Scrub-Jays stimulate interstate commerce from wildlife-watching tourism. Second, extensive scientific research on Florida Scrub-Jays contributes to interstate commerce through travel, jobs, and increasing scientific understanding in broadly applicable fields of study. And third, Florida Scrub-Jays became a threatened species due to residential, commercial, and agricultural development, and that same commercial activity is impacted by the regulation of Scrub-Jay taking on non-federal land.

These circumstances are closely analogous to those deemed to demonstrate a "substantial effect on interstate commerce" in *Gibbs*, 214 F.3d at 493. There, the plaintiffs challenged a Service regulation that limited the taking of red wolves, arguing that its application on private land exceeded Congress's power under the Commerce Clause. *See id.* at 488–90. The Fourth Circuit rejected this argument, citing, among other things, evidence that "tourists travel to North Carolina from throughout the country" to experience red wolves, thereby generating economic activity, *id.* at 493–94; that the wolves were subjects of "scientific research" that "generates jobs" and "deepens our knowledge of the world in which we live," *id.* at 494; and that "the taking of red wolves is connected to interstate markets for agricultural products and livestock" because the human activity that gave rise to a threat of red wolf takings—livestock production—was "economically motivated," *id.* at 495. The facts here demonstrate that regulating the taking of Florida Scrub-Jays creates an equivalent, if not greater, substantial effect on interstate commerce.

    1.    <u>Florida Scrub-Jays Stimulate Interstate Commerce from Wildlife-
Watching Tourism.</u>

Florida Scrub-Jays are a significant driver of interstate wildlife-watching
tourism. Many birdwatchers track and seek to expand their lists of the different
species they have seen over their lifetimes ("life lists") or in a particular year. *See*
Russell Decl. ¶ 7; Schibley Decl. ¶¶ 6–7; Lamoreaux Decl ¶ 4; Nigro Decl. ¶¶ 3, 6.
Thus, the very fact that the Florida Scrub-Jay is found only in Florida means that
birders and other wildlife enthusiasts across the county and around the world must
travel to Florida to experience the species. *Id.* And so they do.

As shown in the accompanying Russell and Lamoreaux Declarations, wildlife
tour companies offer weeklong, multi-person bird-watching tours in Florida that
target and prominently feature Florida Scrub-Jays. *See* Russell Decl.; Lamoreaux
Decl. These companies understand that many birdwatchers come to Florida
particularly to see species, like the Florida Scrub-Jay, that they can't see elsewhere.
Russell Decl. ¶¶ 7-8; Lamoreaux Decl. ¶¶ 4–5. Attesting to the commercial draw of
Florida Scrub-Jays, the companies feature Scrub-Jay photos prominently in tour
marketing and client materials. Russell Decl. ¶ 8; Lamoreaux Decl. ¶ 5.

In recent years, the price of these tours has been approximately $4,000–5,000
for each of the 6–7 participants per tour, and the tour companies spend most of that
money—roughly $20,000 or more per tour—for on-the-ground expenses such as
lodging, travel within Florida, and meals. Russell Decl. ¶¶ 8–12; Lamoreaux Decl. ¶¶
7–8.  In addition, participants pay for their own travel to and from Florida at the

beginning and end of such tours. Russell Decl. ¶¶ 12; Lamoreaux Decl. ¶ 8. These
tours have been offered annually for years and remain popular; due to demand, each
company plans to offer two tours featuring Florida Scrub-Jays in 2026. Russell Decl.
¶¶ 6, 9; Lamoreaux Decl. ¶¶ 6, 10. These declarations present just two examples of
the many tour companies offering similar tour packages featuring Florida Scrub-Jays.
*See* Bloom Decl. Exs. D, E, F.

In addition, as illustrated in the accompanying declarations of individual
birders, many non-Floridians arrange their own travel to and within Florida to see
Florida Scrub-Jays, including in Prairie Creek Preserve, which borders Plaintiff's
subdivision. *See* Schibley Decl. ¶¶ 4–12 (Prairie Creek Preserve); Nigro Decl. ¶¶ 3–9
(Prairie Creek Preserve area); Goggin Decl. ¶¶ 3-7; Gyllenhaal Decl. ¶¶ 4–7; Lebbin
Decl. ¶¶ 15–19. These individuals and their travel companions have spent thousands
of dollars on airfare, car rentals, hotels, and food during their travels to and within
Florida to see Florida Scrub-Jays. *See* Schibley Decl. ¶¶ 9–10; Nigro Decl. ¶ 12;
Goggin Decl. ¶¶ 3, 6, 8, 10; Gyllenhaal Decl ¶ 6.

And these individuals represent just a few examples of a much broader
interstate commerce of birders who travel to Florida, at least in part, to see Florida
Scrub-Jays. The expert report of Ted Gilliland, Ph.D. ("Gilliland Report," attached
as Exhibit 1 to the Gilliland Decl.), estimates that in 2024 over 1,000 non-Florida-
based users of "eBird," a community-science app and website run by the Cornell
University Laboratory of Ornithology, reported Florida Scrub-Jay sightings in
Florida. *See* Gilliland Report at 1–2, 4–5. This total is indicative of an even larger

16

number of out-of-state birders whose travels to Florida include Scrub-Jay

observations, because the quantity of eBird users reporting Florida Scrub-Jay

sightings has been steadily increasing each year as more birders begin using the eBird

platform. *See id.* at 2–3, 8. Indeed, active eBird users make up just a small fraction of

the 43 million Americans who birdwatch away from their homes. *See id.* at 2, 9; U.S.

Fish & Wildlife Serv., Birding in the United States: A Demographic and Economic

Analysis, at 6 (2024) (Bloom Decl. Ex. G).

    As the declarations from individual birders attest, these interstate birders

seeking Scrub-Jays spend money on travel, equipment, food, and lodging,

contributing to Florida's robust and lucrative interstate wildlife tourism market.

According to a Florida government report, in 2011 alone, over 800,000 out-of-state

residents took trips to view wildlife in Florida, generating nearly $2 billion in

economic impacts within the state.[10] Nearly 750,000 of those visitors observed birds

on their wildlife-viewing trips.[11] Thus, as in *Gibbs*, 214 F.3d at 493, federal regulation

of Florida Scrub-Jay taking is substantially related to interstate commerce in wildlife

tourism and travel.

---

[10] Fla. Fish & Wildlife Conservation Comm'n, *The 2011 Economic Benefits of Wildlife Viewing in Florida*
ii, 2, 5 (2013) (Bloom Decl. Ex. H). "Economic impacts" includes over $1 billion in retail sales, as
well as salaries and wages, full- and part-time jobs, and state, local, and federal tax revenues. *See id.*
at ii.

[11] *Id.* at 5.

2.    <u>Florida Scrub-Jays Stimulate Significant Interstate Commerce
through Scientific Research.</u>

In addition to tourism, scientific research on Florida Scrub-Jays also

stimulates interstate commerce. Scientists at Archbold Biological Station, a private

field research facility based on thousands of acres of scrub habitat on the ancient

sand dunes of Florida's Lake Wales Ridge, have intensively studied Florida Scrub-

Jays for more than 50 years in one of the longest running, continuous studies of any

bird species in the world. Swain Decl. ¶¶ 3, 5–6. Over the course of this decades-long

project, Archbold researchers and visiting scientists have tracked the individual life

histories and genetic makeup of over 6,000 individual Scrub-Jays, covering 15

generations, providing an unparalleled window into every aspect of the Scrub-Jay's

biology, behavior, habitat, and management, and creating valuable opportunities for

scientists to combine genetic research with field biology. *Id.* ¶ 7.

The project has had far-reaching impacts. It has generated more than 150

scientific papers and features in many biology textbooks. *Id.* ¶ 8. Its ground-breaking

work has impacted the way scientists around the world think about fire management

and the use of prescribed fire in scrub ecosystems. *Id.* And it serves as a worldwide

model for the effective implementation of a long-term ecological field research

program. *Id*. Recognizing its outsized impact early on, the American Ornithological

Union awarded its 1985 William Brewster Memorial Award for "the most

meritorious body of work on birds of the Western Hemisphere" to Archbold's Scrub-

Jay project, recognizing it for its "significance beyond contemporary ornithology,"

18

and noting that "sociobiology owes a debt" to the project and that "[b]ehavioral

ecology has been enriched" by the "clearer interpretation of apparent 'altruism,'

alternative 'selfish' strategies, and cooperation [that] has developed from these

studies of the Florida Scrub Jay, and those of other species to which they have lent

impetus." *Id.* ¶ 9. Research on Florida Scrub-Jays has thus already expanded

humanity's understanding of broadly applicable scientific fields and will continue to

do so if the species persists, contributing incalculably valuable knowledge to the

world.

Further, interstate-funded Scrub-Jay research creates jobs, spurs travel, and

generates other spending. Since 1987, Archbold has received more than $7 million in

grants from out-of-state sources for scientific research on Florida Scrub-Jays. *Id.* ¶ 10.

Many of these research projects were co-led by out-of-state visiting scientists along

with Archbold staff. *Id.* These grant funds cover a variety of expenses, such as

compensation for researchers and interns, research equipment such as vehicles and

biological sampling tools, and consumables such as gasoline. *Id.*  In addition,

Archbold's Avian Ecology Program, which is focused on Florida Scrub-Jays and is

home to the long-running Scrub-Jay project, has hosted 163 different visiting interns

and researchers since 1969, many of whom have returned multiple times. *Id.* ¶ 12.

These visiting scholars have ranged from undergraduates to scientists with Ph.D.s

and have traveled from all across the country to work with Archbold's resident

Scrub-Jays. *Id.* ¶¶ 12–13. Many spend months at a time at Archbold, contributing to

the local economy. *Id.* ¶ 13. In addition, college and graduate school classes from

19

around the world travel to Archbold to be trained in and experience the long-term ecological field research exemplified by the Scrub-Jay project. *Id.* ¶ 14.

Federal regulation of Florida Scrub-Jay taking is thus significantly related to scientific work to "deepen[] our knowledge of the world in which we live," which generates jobs and substantial research-related commerce and "may have inestimable future value." *Gibbs*, 214 F.3d at 494; *see also Alabama-Tombigbee*, 477 F.3d at 1274– 75 (recognizing that "a species' scientific or other commercial value is not dependent on whether its habitat straddles a state line").

3.    Commercial Activity Led to the Scrub-Jay's "Threatened" Status and Regulating Scrub-Jay Take is Regulation of Commercial Activity.

Regulating the taking of Florida Scrub-Jays is further related to interstate commerce because it affects the interstate market in land development activities. When the Service listed the Florida Scrub-Jay as "threatened" under the ESA in 1987, the Service noted that "[b]y far, habitat destruction" caused by residential, commercial, and agricultural development "has played the major role in the decline of the Florida scrub jay." Listing Decision, 52 Fed. Reg. at 20,717. The Service explained that the "future of the Florida scrub jay depends on the continued existence of its scrub habitat," yet "[m]uch of the coastal scrub has been cleared for beachfront hotels, houses, and condominiums," and "[s]crub habitats in the interior of the Florida peninsula are subject to development for citrus groves and housing developments." *Id.* In addition, "[f]ire suppression to protect human interests" had allowed the scrub in some areas to become too dense to serve as suitable habitat. *Id.*

20

The Service's prognosis for the Scrub-Jay remains the same today. *See* Species Status Assessment at 29–30, *supra* note 3.

Because habitat loss and degradation due to residential, commercial, and agricultural development remains a primary threat to the species, it is not surprising that the Service's regulation of Scrub-Jay take often impacts such development. The County's HCP at issue in this case is an example, as is another recent ESA action involving the Scrub-Jay: a habitat conservation plan and ITP for a warehouse, loading docks, parking lots, stormwater systems, and a road expansion at Florida Crossroads Commerce Park, an industrial park for manufacturing and distribution operations located in Marion County, Florida.[12] As *Gibbs* reasoned, such "takings that are economically motivated" independently constitute a "legitimate subject for regulation" under the Commerce Clause. 214 F.3d at 495. The Tenth Circuit has concluded likewise, holding that "regulation of take of endangered and threatened species is directly related to … economic development and commercial activity" because "the necessity of putting in place the ESA's protections was engendered in part by the excesses of commerce, and the statute acts as a brake on economic activity" in the short term, even while serving "to promote *long-term* commerce by conserving species." *PETPO*, 852 F.3d at 1006.

---

[12] *See* U.S. Fish & Wildlife Serv., Receipt of Incidental Take Permit Application and Proposed Habitat Conservation Plan for the Scrub-Jay; Marion County, FL; Categorical Exclusion, 88 Fed. Reg. 41,981 (June 28, 2023) (Bloom Decl. Ex. I); *see also* Florida Crossroads Commerce Park website, https://floridacrossroadspark.com/ (Bloom Decl. Ex. J).

Federal regulation of Florida Scrub-Jay taking is thus substantially related to
interstate commerce because interstate commercial activities created the need for
regulation and the regulated taking of Scrub-Jays itself is commonly an activity
involving interstate commerce.

**III.    If the Court Does Not Dismiss the Case on Jurisdictional Grounds, It
Should Consider Conservation Groups' Evidence and Grant Summary
Judgment in Their Favor.**

For the reasons discussed above, if the Court reaches Plaintiff's Commerce
Clause argument, it should do so based on the particular facts of this case—not on a
complaint that simply alleges that the Florida Scrub-Jay lacks a substantial relation
to interstate commerce. Accordingly, if the Court does not dismiss the complaint on
jurisdictional grounds, it should consider the evidence Conservation Groups have
submitted with this response, both as an exercise of its discretion under Federal Rule
of Civil Procedure 12(d) and as part of Conservation Groups' affirmative motion for
summary judgment as to all of Plaintiffs' claims under Rule 56(a). *See Prop. Mgmt. &
Invs., Inc. v. Lewis*, 752 F.2d 599, 604 (11th Cir. 1985) (court "has discretion as to
whether to accept material beyond the pleading" on a 12(b)(6) motion).

In this Circuit, "whenever a district judge converts a 12(b)(6) motion to
dismiss into one for summary judgment by considering matters outside the pleadings
the judge *must* give to all parties ten-days notice that he is so converting the motion."
*Prop. Mgmt.*, 752 F.2d at 605 (emphasis in original). Here, after doing so, and
affording the other parties an opportunity to respond with their own evidence, *id.*,
the Court should grant summary judgment for the Conservation Groups because

22

"there is no genuine dispute as to any material fact" and the Conservation Groups are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

As shown above, both the law and the facts demonstrate that the ESA prohibition on taking of Florida Scrub-Jays has a substantial effect on interstate commerce and thus is authorized under the Commerce Clause and the Necessary and Proper Clause of the U.S. Constitution. Accordingly, summary judgment for the Conservation Groups is warranted on Plaintiff's claims against the Federal Defendants, all of which directly rely on the premise that Congress lacked power to authorize regulation of Florida Scrub-Jay taking on non-federal land. *See* Am. Compl. ¶¶ 74–80, 84–90, 94–100 (reciting identical premise for all three claims).

The Court should also grant summary judgment for Conservation Groups on Plaintiff's unconstitutional conditions claim against the County. Plaintiff alleges that the County has forced him into a Hobson's choice between what he contends are two unconstitutional options—either pay the County's mitigation fee (which Plaintiff claims is unconstitutionally high) or pursue an individual incidental take permit from the Service (which Plaintiff claims is beyond Congress's constitutional power to require). *See* Am. Compl. ¶ 3. But that premise fails because, as demonstrated above, federal regulation of Florida Scrub-Jay taking on non-federal land is constitutional, and thus the County's requirement to seek an incidental take permit, either individually from the Service or via the County's HCP, does not put Plaintiff in an unconstitutional bind.

Moreover, Plaintiff's contention that pursuing an ITP from the Service would be "more expensive, more time-consuming, [and] more burdensome" cannot save his claim against the County. Am. Compl. ¶ 1. Plaintiff has chosen to bring this lawsuit instead of pursuing an individual ITP from the Service. Accordingly, any claim premised on the assumed expense, burden, or length of pursuing an ITP from the Service is not ripe. *See Nat'l Advert. Co. v. City of Miami*, 402 F.3d 1335, 1340 (11th Cir. 2005) (constitutional challenge to City signage ordinance not ripe before final decision on how ordinance would be applied to plaintiff); *United Water Conservation Dist. v. United States*, 133 F.4th 1050, 1058–59 (Fed. Cir. 2025) ("Having yet to have been denied an incidental-take permit under Section 10 of the ESA, United has therefore not pleaded a ripe takings claim.").

Finally, Conservation Groups recognize that, as a general rule, "the party opposing a motion for summary judgment should be permitted an adequate opportunity to complete discovery prior to consideration of the motion." *Jones v. City of Columbus*, 120 F.3d 248, 253 (11th Cir. 1997). Nonetheless, Federal Rule of Civil Procedure 56(d) (formerly 56(f)) provides the method for a summary judgment opponent to protect itself against premature summary judgment. Under that rule, the opponent must "show[] by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). Any such Rule 56(d) submission must "set[] forth with particularity" the facts the party opposing summary judgment "expects to discover and show how those facts would create a genuine issue of material fact precluding summary judgment." *Harbert Int'l*,

24

*Inc. v. James*, 157 F.3d 1271, 1280 (11th Cir. 1998). If the opponent fails to do so, the Court may grant summary judgment even if discovery has not yet begun. *See Sharkey v. Food & Drug Admin.*, 250 F. App'x 284, 286, 291 (11th Cir. 2007) (affirming grant of defendant-intervenor's pre-discovery summary judgment motion, where opponent failed "to state with particularity the facts he believes discovery will reveal sufficient to create a genuine issue of material fact"). Here, given the clarity of the legal issues and the common-sense nature of Conservation Group's evidence, the Court should be skeptical of any claim that discovery would reveal material fact disputes.

## CONCLUSION

If the Court does not dismiss the case on jurisdictional grounds, it should consider Conservation Groups' evidence and grant summary judgment for the Conservation Groups.

Respectfully submitted this 12th day of May, 2025.

  /s/ Aaron Bloom
Aaron Bloom *(By Special Admission)*
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
Phone: (917) 410-8727
abloom@earthjustice.org

Sharmeen Morrison (*By Special Admission*)
Earthjustice
50 California Street #500
San Francisco, CA 94111
Phone: (415) 217-2005
Fax: (415) 217-2040
smorrison@earthjustice.org

Alisa Coe
Earthjustice
111 S. Martin Luther King Jr. Blvd.
Tallahassee, FL 32301
Phone: (504) 388-6251
Fax: (850) 681-0020
acoe@earthjustice.org

*Counsel for Defendant-Intervenors*